UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HERSHEL L. VANOY,

              Plaintiff,                       Case No. 05-71921

vs.

                                       HONORABLE LAWRENCE P. ZATKOFF
                                       HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

              Defendant.
_____/

**REPORT AND RECOMMENDATION**

## I.    BACKGROUND

Hershel L. Vanoy brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

### A. PROCEDURAL HISTORY

 Plaintiff applied for DIB on August 10, 2001, alleging that he was disabled as of December 6, 1999 (R. 19, 71).  After Plaintiff's application was initially denied, a March 7, 2002, hearing was held before administrative law judge ("ALJ") Douglas N. Jones who issued a decision on March 27, 2002, finding Plaintiff not to be entitled to a period of disability.  (R. 348 - 393, 198 - 207).  On August 28, 2003, the Appeals Council issued an order that vacated the prior decision and remanded the case for further proceedings, including an opportunity for a new

hearing.  (R. 229 - 232).  A second hearing was held on June 3, 2004, before ALJ Jones. He

issued a decision granting the Plaintiff a period of disability under Medical-Vocational Rule

201.09 as of July 16, 2003, Plaintiff's 50th birthday, but not as of his claimed December 6, 1999,

date of disability.  In this action, Plaintiff seeks benefits for periods prior to July 16, 2003.

### B. BACKGROUND FACTS

#### 1. PLAINTIFF'S HEARING TESTIMONY

##### A. MARCH 7, 2002, HEARING

At his hearing on March 7, 2002, Plaintiff stated that he lived in a two story house with

his wife and 24 year old daughter in Flint, Michigan (R. 352).  Plaintiff's wife and daughter both

work and they are out of the house from 8:00 to 5:00 each day.  (R. 353).  Plaintiff has not

worked since December 6, 1999, when the shop he worked at could not accommodate the

physical restrictions that his doctor gave him.  Since December 1999, Plaintiff has received a

$1,952 pension per month and $569.46 in workers compensation per week.  (R. 354).  Plaintiff's

highest level of education was the 10th grade.[1]  Plaintiff is 5' 7", 158 pounds and is left handed.

Plaintiff testified that he owns a car and drives it about once a day.

In 1990, Plaintiff testified that he had a cervical fusion in his neck to repair two ruptured

disks.  (R. 368).  Plaintiff has had three back surgeries.  (R. 355).  The first was in 1998 and was

to remove two ruptured disks and put in three titanium spacers.  (R. 356).  The second, also in

1998, was to deal with stenosis that followed the first surgery.  The third surgery was to fix a

---

[1] Although Plaintiff finished the 10th grade, he also testified that 6th grade was the last grade in which he actually attended class and received passing grades.  He failed classes in the 7th and 8th grades, and didn't go to school at all in the 9th.  When he came back to school, he was put in the tenth grade.  "I went through the tenth and that was it.  After – I went three days in eleventh grade, and that was it."  (R. 367 - 368).

fracture in Plaintiff's spine above where the first two surgeries were.  Plaintiff had injured his back in a work place accident while installing rocker panels.  (R. 366).  In the process of repairing the fracture, some damage was done to the of the first two surgeries that had to be corrected.  (R. 357).

Plaintiff suffers from dizziness and migraines, the migraines are triggered by "touching on the back of my neck or certain portions of my head."  (R. 369, 370).  Plaintiff testified that he takes some over the counter medication and takes Inderal (prescription) every day to help with his migraines.  (R. 362 - 363).  Plaintiff's migraines used to occur only once or twice a year, but Plaintiff testified that they have been more frequent over the last three or four years (R. 375).

Plaintiff smokes about a pack of cigarettes a day but stated that he is trying to quit.  (R. 363 - 364).  Plaintiff testified that he does not drink.  Plaintiff estimated that, with his cane, he can walk about 50 feet.  He can only stand for a short period of time because his right leg hurts badly and he must stand solely on his left leg.  (R. 365).  Plaintiff sometimes uses a cane that was prescribed for him in January 1998. (R. 373).

Plaintiff had several different jobs while working at General Motors, most of which required him to work on his feet, except for his final job, as a fork truck driver.  (Id.).

Plaintiff tries not to cough or sneeze, because if he does: "[I]t just breaks my back right in two[.] It puts me right to the floor."  (R. 373).  Plaintiff had some physical therapy after his back surgeries but has not had any since August 21, 2000.  (R. 376, 377).  Plaintiff testified that his conditions and ailments are the same as they were at his last physical therapy session.  (R. 377, 378).

Plaintiff still participates in a home exercise program about twice a week that includes

stretching and pulling.  (R. 379).  Plaintiff cannot rake leaves because he cannot twist his back.

(R. 381).  He can mow his lawn but has to take breaks every half hour or so.  Plaintiff takes naps

often because he gets tired and doing so relaxes his leg and back.  Plaintiff does have the

occasional good day, but even then he still has pain, just not as bad.

### B. JUNE 3, 2004, HEARING

At his hearing on June 3, 2004, Plaintiff stated that he lived in the same house, with his

wife and daughter, that he lived in during the first hearing (R. 398).  He still saw Dr. Steven

Shapiro as his primary care doctor (R. 399).  Plaintiff still smokes a pack of cigarettes a day.  (R.

399).  Plaintiff noted that he has "perfect" blood pressure and that his doctor does not know what

causes his dizziness.  (R. 400 - 401).  Plaintiff now takes Aleve, Lipitor (for cholesterol), Inderal

(for dizziness), and Zyprexa (for bipolar disorder).[2]  (R. 399).  Plaintiff takes about 500 Aleve a

month which has caused him GI problems, "like dumping salt on an open wound in my

stomach," as well as problems swallowing.  (R. 405).  Plaintiff's trouble swallowing causes

difficulty breathing.  Plaintiff now takes fewer Aleve which reduced the difficulty with

swallowing.  (R. 412).  Plaintiff's says his migraine headaches have been less frequent due to a

reduction of stress in his life.  He still gets migraines once or twice a month, which are

excruciating and usually last four to five hours.  (R. 410, 411).  Plaintiff is allergic to Demerol.

(R. 406).

Plaintiff testified that the pain in his leg and back is the same as it was at his previous

hearing and that laying down gives him the most relief  (R. 406).  In addition to the pain in his

---

[2] Plaintiff was experiencing a lot of depression and mood swings.  Plaintiff acknowledged that the Zyprexa helped with the mood swings.  (R. 404).

4

back and leg, Plaintiff testified that he has fluid in his knees.  (R. 409).

Plaintiff testified that he has not worked since the previous hearing and his only income is his worker's comp benefits and his General Motor's pension (which includes health insurance).  (R. 401, 402).  Plaintiff testified that he spends a lot of his day watching television and napping.  (R. 407).  Plaintiff helps his wife some around the house and mows the lawn (the vibration of the mower bothers his back and therefore he must take many breaks).  (R. 414). Plaintiff will not pick up a gallon of milk but can pick up small containers of cat food.  (R. 415).

## 2. MEDICAL EVIDENCE

### A. Medical Evidence Before Alleged Disability Date

Plaintiff saw Steven R. Shapiro, D.O., many times from June 4, 1996, to November 19, 1999.  (R. 303 - 321).  During this time Plaintiff complained of dizziness, nausea, vomiting headaches and difficulty hearing[3].  Dr. Shapiro determined his problems to be labryinthitis and treated his symptoms with Antivert and Inderal.  By September 12, 1997, Plaintiff reported almost no headaches since he began taking Inderal.  (R. 313).  On February 10, 1998, Plaintiff told Dr. Shapiro that he stopped taking Inderal but that he did not get headaches if he ate frequently and that his dizziness also improved (R. 310).

In a letter to Dr. Shapiro dated February 23, 1998, neurosurgeon Clifford C. Douglas, M.D., reported that an MRI showed degenerative disc disease at L4 - L5 and L5 - S1 with disc space collapse, a herniated intervertebral disc, a reduced foraminal volume, and secondary facet

---

[3] In January 1997, Plaintiff also saw Wayne K. Robbins, D.O., several times, on referral from Dr. Shapiro, for the same symptoms.  (R. 322 - 324).  Neither Doctor Shapiro nor Dr. Robbins were able to reproduce Plaintiff's dizziness and nausea with head and eye motion but did by syringing a blockage of the right ear.  (R. 321, R. 323).

arthropathy with nerve root impingement.  (R. 103 - 105).  On March 5, 1998, Dr. Douglas
performed a balloon-assisted retroperitoneal gasless laproscopic surgical procedure at L4-5 and
L5-S1 with a titanium cage fusion (R. 108- 13).  But, by August 28, 1998, Dr. Douglas reported
that an MRI showed continued significant foraminal stenosis (R. 101-02).  Plaintiff reported that
he had less lower back pain and lower extremity symptoms but was experiencing significant and
severe right lower extremity pain (especially when he coughs or twists in the wrong direction)
causing an incapacitating pain shooting down his right lower extremity.  (R. 101).  On
September 18, 1998, Dr. Douglas performed a bilateral foraminotomy and diagnosed Plaintiff
with bilateral L4 - L5, and L5-S1 foraminal stenosis (R. 98-100).

On an October 8, 1998, visit to Dr. Shapiro, Plaintiff was better in terms of his lower
back pain, however, he recently experienced significant right lower extremity pain.  (R. 306).
On November 24, 1998, Dr. Shapiro placed Plaintiff back on Inderal to help the headaches and
dizziness that Dr. Shapiro believed to be a vertebral basilar migraine.  (R. 306).  On January 26,
1999, Wilbur J. Boike, M.D., a neurologist, reported to Dr. Douglas that he examined Plaintiff
for complaints of back pain and radiation into the right sacroiliac joint, with some achy right leg
pain, which worsens when he stood and decreased when he sat.  (R. 131).  Plaintiff experienced
some worsening of pain while at work and wears a back brace.  On examination, Dr. Boike
reported completely normal strength, coordination, tone and bulk in all extremities with normal
sensory findings.  (R. 131-32).  Strength, coordination, tone and bulk were normal in all
extremities.  (R. 131). A sensory exam was also normal.  Reflexes were 2 + and symmetric at the
biceps, triceps and knees, but ankle jerks were absent bilaterally and the toes were downgoing to
plantar stimulation.  Lumbosacral spinal flexibility was markedly reduced. Although Plaintiff

had some degree of radicular discomfort, Dr. Boike concluded that Plaintiff's primary problem was musculoskeletal ("mechanical") low back pain. (R. 132)  Dr. Boike recommended an aggressive comprehensive spinal reconditioning program and placed Plaintiff on Neurontin.

On July 27, 1999, Dr. Shapiro reported that Plaintiff told him he had been returned to work and was doing well until he suffered a work-related injury which caused pain in his low back and leg (R. 304).  Plaintiff reported that he had no headache pain since restarting Inderal.

On August 25, 1999, Dr. Douglas reported to Dr. Shapiro that he treated Plaintiff for his work-related injury caused when Plaintiff's partner dropped the end of a heavy object which resulted in secondary pain in Plaintiff's back.  (R. 122).  Dr. Douglas suggested that Plaintiff should do a different job with less heavy lifting.  He noted that X-rays looked "very good" with the fused cage "nicely positioned."  (R. 123).  Dr. Douglas planned to follow-up as needed.

On November 8, 1999, Dr. Douglas reported that Plaintiff continued to relate significant difficulties with low back pain and right hip pain (R. 120).  As in the August report, Dr. Douglas noted that Plaintiff had been doing quite well after his second surgery until he was re-injured at work.  Since then, Plaintiff had experienced significant pain.  Dr. Douglas reiterated that Plaintiff could no longer do his past heavy work.  On exam, Plaintiff's motor and sensory exam were intact, with generally hypoactive reflexes and severely limited range of back motion.  He restricted Plaintiff to no prolonged walking, standing, twisting or bending with a weight restriction of seven pounds for one year.  Dr. Douglas planned to follow up with Plaintiff in three to six months.  (Id.).  Following a November 12, 1999, whole body bone scan and spect imaging of the lumbar spine, Dr. Douglas' impression was degenerative changes at the acromioclavicular articulations and bone turnover at the L4 - L5 level.  (R. 125).

7

**B. Medical Evidence Since Plaintiff's Alleged Disability Onset Date**

On February 24, 2000, Dr. Douglas referred Plaintiff to Dr. Christopher S. Sweet for an MRI of his lumbar spine which showed a recurrent right paramedian disc herniation leading to effacement upon the exiting right L4 and right L5 nerve roots. (R. 130).

In a March 6, 2000, letter to Dr. Shapiro, Dr. Douglas recommended surgical decompression to address the Plaintiff's trauma induced spinal stenosis with right-sided leg pain and weakness and radiculopathy of the L4 and L5 nerve roots on the right. (R. 118 - 119).

On April 25, 2000, Dr. Douglas performed a right-sided L4-5 and L5-S1 foraminotomy with neural decompression, decompression of the L4 and L5 nerve roots, L4-5 diskotomy and resection of the epidural cicatrix, microscope with microdissection, and Epidural Depo-Medrol placement (R. 133-36). Dr. Douglas' postoperative diagnosis was "secondary acute right-sided L4 and L5 radiculopathy status post L4-5 and L5-S1 anterior lumbar interbody fusion with foraminal stenosis and possible recurrent disk herniation. ... Acute fracture of the facet joint noted at L4-5 and recurrent disk herniation along with profound epidural scar tissue formation and secondary foraminal stenosis noted." (R. 134).

On May 24, 2000, Plaintiff began a course of physical therapy (R. 126 - 129). On a May 30, 2000, visit, Dr. Shapiro put Plaintiff on Naprosyn. (R. 300). By August 21, 2000, Heather Schoen, a physical therapist, reported that Plaintiff was progressing slowly and had partially met his treatment goals. (R. 126). Plaintiff had normal (5/5) strength in both legs in all directions. His right piriformis muscle was moderately tight and elicited low back pain when stretched, and Plaintiff stood with flexed knees and an uneven weight distribution favoring his left leg. His tolerance for standing or walking was less than two minutes due to back pain and Plaintiff

reported that he had increased back pain with increased exercise.

On June 16, 2000, Plaintiff told Dr. Shapiro that he had not had a migraine headache for a long time (R. 300).  Dr. Shapiro discontinued his Lescol, put him on Baycol and continued him on Inderal.  On August 23, 2000, Dr. Douglas noted that physical therapy had not helped Plaintiff.  (R. 284).  He noted mild findings with 4+ +/5 strength.

On August 28, 2000, Plaintiff's final physical therapy session, Ms. Schoen noted that Plaintiff progressed slowly.  (R. 327).  Bilateral lower extremity strength was 5/5 in all directions. Upright posture showed no deviation. Plaintiff, however, stated that he was still unable to tolerate standing/walking for fifteen to twenty minutes without increased symptoms, still experienced painful sit to stand transfers, and was unable to return to full activities.  (Id.).

On August 29, 2000, Plaintiff saw Dr. Shapiro for a putric papular dermatitis.  (R. 299). Dr. Shapiro prescribed Kenalog cream and Atarax.

On October 23, 2000, at the request of the agency, Plaintiff underwent a disability determination consultative examination performed by Christopher Y. Chang, M.D. (R. 137-139).  Plaintiff told Dr. Chang that he had low back pain which radiated to his right leg (R. 137). On examination, Dr. Chang reported that spinal curvature was not physiologically maintained and that there was decreased lumbar lordosis.  In addition, there was no mass or deformity, but tenderness found at his lower back.  Plaintiff had limitations in spinal motion with some right leg weakness (4/5) at the knee and ankle, with mildly decreased straight leg raising on the right, and Plaintiff had some difficulty bearing weight on the right side secondary to right hip pain. There was no deformity, atrophy or edema present in any extremity; range of motion of Plaintiff's extremities was normal; muscle tone in both extremities was normal; and Plaintiff had normal

9

coordination and sensory testing, with symmetrical deep tendon reflexes at the knees and ankles. Plaintiff was unable to squat, heel, toe or tandem walk and used a cane for ambulation. Plaintiff acknowledged that he could walk short distances without a cane.  Dr. Chang diagnosed lumbar disc pain syndrome.

On March 14, 2001, Plaintiff told Dr. Douglas that he had pressure-like pain in his right low back and hip that extended around to his right lower abdomen and radiated to his entire thigh and down his leg to his entire foot, which usually occurred with standing or walking, but not with sitting or lying down.  (R. 285).  On physical examination, Dr. Douglas reported intact motor and sensory findings in both lower extremities and noted L4 and L5 nerve root decomposition.

On April 11, 2001, John C. Kohn, D.O., of the Pain Management Center of Flint wrote to Dr. Douglas that he examined Plaintiff for his complaints of low back pain radiating down his right leg with right leg numbness from the knee down (R. 287 - 291).  Dr. Kohn observed that Plaintiff walked with a slightly antalgic gait favoring his right leg; was able to raise up on his heels and toes; but was limited by pain to 60 degrees of forward lumbar flexion and to no lumbar extension.  (R. 290).  There was right sciatic notch tenderness.  Deep tendon reflexes were +1/+4 and symmetrical in the patellar areas; +1 in the left Achilles and 0 at the right Achilles.  Muscle strength testing of both legs was full and symmetrical with the exception of the anterior tibial group which was 4/5 on the right.  Straight leg raising was negative on the left, and was positive for back pain on the right, but negative for radicular pain when performed in the seated and supine position.  There was a neurosensory deficit to pin prick and light touch on the dorsum of the right foot and negative Patrick's testing.  Dr. Kohn stated that he detected no other sensory,

motor or reflex abnormalities (R. 290-91).  Dr. Kohn diagnosed post laminectomy syndrome

with right L-5 radiculopathy.  (R. 291).  Dr. Kohn proposed treatment with a series of caudal

epidural steroid injections, yet Plaintiff declined this treatment because of his fear of needles.

(R. 291, 287-88).

Between March 30, 2001, and May 1, 2003, Plaintiff saw Dr. Shapiro a few times for

complaints of migraine headaches and hearing loss which were successfully treated with

medication and the removal of cerumen (R. 293-98).  There are no medical records in the file

beyond May 2003.

### 3. VOCATIONAL EVIDENCE

### A. MARCH 7, 2002, HEARING

ALJ Jones questioned Vocational Expert ("VE") Timothy Shaner with regard to the

following hypothetical: An individual with the same age, vocational background and education

of the Plaintiff; the ability to perform sedentary work but not able to be on his feet for more than

two hours out of the workday; could lift up to ten pounds frequently; could occasionally bend at

the waist; could occasionally bend at the knees; could occasionally twist at the torso; would

never kneel, crawl, climb ladders; could occasionally climb stairs; would not engage in

prolonged or repetitive rotation, flexion or hyperextension of the neck.  (R. 386).  VE Shaner

noted that there are 17,000 jobs in the lower peninsula of Michigan that this hypothetical

individual could do including: 1,800 information clerk positions, 1,800 visual inspector

positions, 5,600 order clerk positions, 1,700 telephone answerer positions.  (R. 386 - 387).  ALJ

Jones then modified the hypothetical to indicate that the individual would never be able to climb

stairs in the course of the job, they would never twist their torso and never bend at the waist.  (R. 387).  VE Shaner responded that these modifications would not affect the jobs she listed.[4]

### B. JUNE 3, 2004, HEARING

ALJ Jones questioned VE Stephanie Leech with regard to the following hypothetical: An individual with a tenth grade education with the same age (almost 51) and the same work experience as the Plaintiff, who

> is limited to performing sedentary work that involves only occasional bending at the waist or the knees, occasional twisting of the torso, occasional kneeling, but no crawling, only occasional climbing of stairs and then required the ability to use a handrail in order to do that, and no climbing of ladders and no exposure – well, yes, no exposure to unprotected heights or intrinsically hazardous uncovered moving machinery, and no prolonged or constant rotation flexion or hyperextension of the neck.

(R. 416 - 417).

VE Leech testified that the hypothetical individual would not have been able to do any of the Plaintiff's past work.  (R. 418).  She identified 30,000 general clerk jobs, 1,500 surveillance system monitor jobs, 1,000 information clerk jobs and 2,000 sorter jobs that the hypothetical individual could perform.  (R. 426).  VE Leech added that requiring a sit stand option would reduce the clerk jobs to 7,500, the information clerk jobs to 750 and the sorter jobs to 1,000.  When ALJ Jones added the need to lie down or rest for thirty minutes during the work day, all jobs were eliminated.  (R. 427 - 428).

### 4. THE ALJ'S DECISION

ALJ Jones found that the claimant had not engaged in substantial gainful activity since the alleged disability onset date of December 6, 1999, and had been unable to perform his past

---

[4] VE Shaner also testified that changing the lifting of 10 pounds to only an occasional basis or adding a sit/stand option would not affect the number of jobs either.  (R. 387).

relevant work since that date as well.  (R. 28, 29).  Plaintiff had no transferable skills from his

past relevant work to jobs within his residual functional capacity.  (R. 29).  ALJ Jones found the

combination of Plaintiff's ailments to be considered "severe" within the meaning of the

Regulations.[5]  (R. 28).  The Plaintiff's medically determinable impairments did not meet or equal

any impairment contained in Appendix 1, Part 404, Subpart P of the Regulations.

    ALJ Jones found the Plaintiff's allegations regarding his functional limitations to lack

credibility.  (Id.)  ALJ Jones determined that no period of 12 consecutive month elapsed during

which the claimant lacked the residual functional capacity to perform sedentary work as defined

in 20 CFR § 404.1567.

    Using VE Leech's testimony and  Medical - Vocational Rule 201.18 as a framework for

decision  making for periods  prior to July 16, 2003, when Plaintiff  was "younger individual

between 45 and 49," with a "limited education," ALJ Jones found Plaintiff to be not disabled.[6]

(R. 28, 29).  After that date, however,  ALJ Jones found Medical - Vocational Rule 201.09

directed him to find Plaintiff disabled because he fell into the category: "closely approaching

---

[5]     "The claimant has medically documented impairments best described as: degenerative disc disease of the cervical spine status post laminectomy, discectomy and fusion at C-5/C-7 (1992); degenerative disc disease of the lumbar spine status post laminectomy, discectomy and fusion L-4/S-1 (March 5, 1998) and status post formaninotomies and decompression procedures (September 18, 1998 and April 25, 2000) with continued "post laminectomy syndrome;" hypoglycemia; excessive ear wax production with no loss of hearing; high cholesterol; and a history of episodic migraine headaches and dizziness generally controlled by medication and diet."
ALJ Jones' June 9, 2004, Decision.  (R. 29).

[6]     "Although the claimant's limitations do not allow him to perform the full range of sedentary work, when Medical-Vocational Rule 201.18 is used as a framework for decision-making, there are a significant number of jobs in the national economy he could perform *before July 16, 2003*.  Examples of such jobs include work as a surveillance system monitor, general office clerk, information clerk and sorter."
ALJ Jones' June 9, 2004, Decision.  (R. 29).

advanced age."[7]  (R. 28).

## II.    ANALYSIS

### A. STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is

supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and*

*Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v.*

*Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than their

past work, the testimony must be given in response to a hypothetical question that accurately

describes Plaintiff in all significant, relevant respects.[8]  A response to a flawed hypothetical

---

[7]      "Beginning July 16, 2003, the claimant was 50 years of age, and defined as a person "closely approaching advanced age."  Under these circumstances, Medical Vocational Rule 201.09 would direct a conclusion of "disabled" even if the claimant could perform the full range of sedentary work, and the claimant has been "disabled" as of July 16, 2003."
ALJ Jones' June 9, 2004, Decision.  (R. 29).

[8] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A

14

question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

## B. FACTUAL ANALYSIS

Plaintiff raises three challenges to the Commissioner's decision: (1) ALJ Jones did not properly apply Listing 11.08 as it pertains to the Plaintiff; (2) ALJ Jones relied on an inadequate hypothetical question which failed to consider Plaintiff's need to lie down and the migraines Plaintiff develops when placed under the stress of the work environment; (3) ALJ Jones let personal issues interfere with his obligation to issue an impartial decision based upon his unbiased assessment.  (Dkt. 10, Plaintiff's Motion for Summary Judgment, p. 15).

Plaintiff is correct in his assertion that "[i]f a claimant meets a Listing of Impairments, the claimant automatically qualifies for benefits regardless of any other evidence that may exist." (Plaintiff's Motion for Summary Judgment, p. 11, Dkt. # 10).  Listing 11.08 reads: "Spinal cord or nerve root lesions, due to any cause with disorganization of motor function as described in 11.04B."  20 C.F.R. 404 Subpart P, Appendix 1.  11.04B reads: "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station."  20 C.F.R. 404 Subpart P, Appendix 1.  While it is possible that Plaintiff's back problems could have met the objective standards of listing 11.08, Plaintiff did not provide medical testimony or other evidence from which a fact finder would have to find, as a matter of law, that Plaintiff had significant and persistent disorganization of

---

vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.

Plaintiff argues that his "inability to walk for more than minutes and his inability to walk more than 50 feet make it clear that this condition significantly interferes with locomotion, gait and station." (Plaintiff's Motion for Summary Judgment, p. 12, Dkt. # 10). There is no question that Plaintiff's medical ailments affect his ability to walk. Yet, whether or not Plaintiff meets the listing is a decision left to the discretion of the ALJ and should be upheld unless the medical records show unequivocally that Plaintiff meets a Listing. In this case the evidence is more equivocal for the relevant time periods from December 1999 to July 2003. Within four to five months of his March 1998 back surgery, Plaintiff returned to his medium or heavier work (R.122, 137), resulting in another injury and follow up surgery. Yet, during this period, his surgeon, Dr. Douglas did not talk about total disability, but rather urged lighter exertional work for Plaintiff. It is also significant that in 2002 Plaintiff was only taking over the counter pain medication (R. 95), which was noted by the ALJ at the first hearing. (R.361) (Compare to medications listed on the March 2004, Vocational Analysis form). While Plaintiff often used a cane, and was limited in his walking capacity with or without a cane, this evidence is not sufficient for this Court to conclude that no fact finder could reasonably determine this did not rise to a "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station" as is required by listing 11.08. A review of the record demonstrates that reasonable minds could differ on this issue, and thus ALJ Jones' opinion that Plaintiff does not meet listing 11.08 is within the realm of reason and is supported by substantial evidence. *See Studaway v. Sec'y of*

16

*HHS*, 815 F.2d 1074 (6th Cir. 1987).

Secondly, Plaintiff argues that ALJ Jones failed to include certain restrictions in his hypothetical question to VE Leech and that therefore Ms. Leech's testimony is "flawed and unreliable." (Plaintiff's Motion for Summary Judgment, p. 14, Dkt. #10). A hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant. *Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir. 1987) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments'"). The ALJ may pose hypothetical questions to the VE which include only those limitations which the ALJ finds credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993).

*Plaintiff's objection is based on ALJ Jones' failure to include Plaintiff's need to lie down in the hypothetical.*[9] First, ALJ Jones did in fact include Plaintiff's alleged need to lie down for 30 minutes (not at normal breaks) in a hypothetical question given to VE Leech, and she acknowledged that this restriction would eliminate the jobs she had identified. (R. 427). Secondly, while there are no doctors' directives that laying down is necessary to alleviate pain, these are not necessary. Felisky v. Bowen, 35 F.3d 1027, 1041 (6th Cir. 1994) stated:

> [t]he only factor weighing against [claimant] is that no doctor of record has stated that she must lie down for long periods of time in order to relieve her pain. This factor is legally insufficient to support a rejection of Felisky's credibility, as it does not constitute substantial evidence.

While the absence of a doctor affirming this alleged need to lie down for relief is not

---

[9] Plaintiff stated that he either needed to lie down to relieve pain throughout his two hearings. (R. 369, 371, 381, 388, 406, 427, 439).

sufficient to reject a claimant's credibility, the absence of any reference in the medical record

can be considered relevant evidence.  Yet, even when a doctor does make such a reference, as

was suggested during the Plaintiff's testimony, the key question is not whether lying down

provides "the most relief" (R. 406), but whether it is a necessary mode of relief.  The issue is,

can Plaintiff cope in a sedentary job without the need to lie down, or can Plaintiff limit his time

lying down to break periods.

> Here, ALJ Jones found the Plaintiff's allegations not credible:

> Although the documented impairments undoubtedly generate symptoms of the
> general type described, the claimant's assertions concerning their intensity,
> persistence and functionally limiting effects are not substantiated by the objective
> clinical findings and medical tests in the record.

(R. 25).

ALJ Jones also pointed to the fact that he found the Plaintiff's allegations to be

"internally inconsistent" pointing out, for example "his testimony that he cannot stand more than

a few seconds without a cane, but doesn't use a cane when is [sic] at home, and his testimony

that lying on his back causes migraine headaches, but he is most comfortable lying down."  (R.

26).  These factors can be considered by an ALJ in deciding whether to discount the credibility

of a claimant regarding the severity of his alleged symptoms.

Lastly, Plaintiff argues that there was "not substantial evidence in the record" to deny

Plaintiff benefits and that ALJ Jones did not decide the case impartially .  (Plaintiff's Motion for

Summary Judgment, p. 15, Dkt. # 10).  Generally, under 42 U.S.C. § 405(g), the findings of an

ALJ are conclusive if they are supported by substantial evidence.  Accordingly, the court's

"review is limited to determining whether there is substantial evidence in the record to support

the findings." *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 851 (6th Cir.

18

1986). In addition, it is for the Secretary to resolve conflicts in the evidence and to decide questions of credibility. *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987). The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion and substantial evidence standard presupposes that there is a "zone of choice" within which the Secretary may proceed without interference from the courts. *Mullen*, 800 F.2d at 545. Here, as mentioned above, ALJ Jones' decision clearly relied on appropriate medical evidence and his credibility determinations were within his discretion.

Claimants clearly have a right to an unbiased ALJ. 20 C.F.R. §§ 404.940.[10] In proper situations remand for a full and fair hearing before a different ALJ can be ordered by the court. *Ventura v. Shalala,* 55 F.3d 900, 903-05 (3d Cir. 1995) (ALJ's impatience, interrogations, and hostility to a claimant's representative undermined a full and fair hearing). This Court will not assume impropriety on the part of an ALJ unless clear evidence supports an accusation. Here, Plaintiff's only arguments are earlier comments of ALJ Jones suggesting a closed period of disability through October 2000 along with alleging a conflict between ALJ Jones and Plaintiff's counsel. Plaintiff's counsel suggests that ALJ Jones' comments indicated an admission that Plaintiff was disabled for "18 months, more or less" in 1999 and 2000. (R. 357-58). It seems clear that at the first hearing ALJ Jones thought Plaintiff was not disabled by the time he saw

---

[10] "An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision. If you object to the administrative law judge who will conduct the hearing, you must notify the administrative law judge at your earliest opportunity. The administrative law judge shall consider your objections and shall decide whether to proceed with the hearing or withdraw. If he or she withdraws, the Associate Commissioner for Hearings and Appeals, or his or her delegate, will appoint another administrative law judge to conduct the hearing. If the administrative law judge does not withdraw, you may, after the hearing, present your objections to the Appeals Council as reasons why the hearing decision should be revised or a new hearing held before another administrative law judge."
20 CFR 404.940

DDS's consultant, Dr. Christopher Chang, on October 23, 2000 (R. 137-146).  ALJ Jones noted

no prescription medications except Inderal for the migraines, which were relatively controlled in

number (R. 361-63).   He refers to Dr. Chang's report as "the last medical evidence that I think

I've seen" (R. 358).   Dr. Chang, in that report, determined that Plaintiff could lift 10-20 pounds,

stand or walk 2 hours and sit 6 hours in an 8 hour work day (R. 142).  He questioned Plaintiff's 5

pound lifting limit because he believed "doing laundry and yard work would require more than 5

pounds."  (R. 146).   In this context, Judge Jones' reference to an 18 months closed period of

disability was not an "offer" to make such a finding, but could be read as a suggestion that,

without more and better current medical evidence supporting disability, Plaintiff's counsel might

best argue for a closed period of disability from some time in 1999  through  Chang's October

2000 report suggesting substantial recovery.

    Also, after Plaintiff's March 1999 surgery he returned to work until he re-injured his

back in July.  On July 27, 1999, Dr. Shapiro saw Plaintiff.  Then on August 25, 1999, Dr.

Douglas saw him and recommended that Plaintiff should do a different job with less heavy

lifting. (R. 122).   There was no sense of crisis indicated in the medical records, Dr. Douglas

believed Plaintiff's X-rays looked "very good" and that he only planned to follow-up as needed.

(R. 123).  He saw him again for significant pain on November 8, 1999, at which time Plaintiff's

motor and sensory exam were intact.  Dr. Douglas again suggested lighter work and placed

restrictions of no prolonged walking, standing, twisting or bending with a weight restriction of

seven pounds for one year.  The follow up plan was three to six months.  After a February 2000

MRI and consultation with Dr. Christopher S. Sweet showing recurrent right disc herniation L4-

5, Dr. Douglas performed a further surgery at L4-5 and L5-S1 on April 25, 2000. (R. 133-36).

Plaintiff was in physical therapy from May to August of 2000.  While Dr. Douglas' notes indicated this therapy did not help (R. 284) some of his entries suggest improvements: "better than it was, a lot better," "when he sits and relaxes — no pain," "walking every day" (May 3, 2000, R. 282);  "'whole lot better'", "better c. PT", "Feeling much better 90%, but can't stand or walk for a long period of time, i.e. 5 min," "PT . . . has been helpful" (June 28, 2000, R. 283). While the period from July 1999 through August (when therapy ended) or October 2000 (when Dr. Change saw Plaintiff) exceeds 12 months, the evidence again is equivocal in this period.  It cannot be said as a matter of law that no reasonable fact finder could conclude that Plaintiff could do a limited range of sedentary work (within Dr. Douglas' suggested restrictions) for significant segments of this period  such as in the fall of 1999 when the medical records did not suggest any urgency other than to lighten up on the exertional level.  The degree of improvement after the April 2000 surgery is also unclear when the many positive reports from Dr. Douglas' notes are considered.  In such situations, courts should defer to the credibility determinations and factual findings of the ALJ.

Nor can it be said that ALJ Jones' exchanges with Plaintiff's counsel at the hearing on a closed period of disability or his conflicts with counsel, nor  his finding of non-disability for periods prior to July 16, 2003, are sufficient evidence to demonstrate any bias warranting a reversal of ALJ Jones' decision and a remand of this case for another hearing.


III.   RECOMMENDATION:

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.

21

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: May 12, 2006                              s/Steven D. Pepe
Ann Arbor, Michigan                              UNITED STATES MAGISTRATE JUDGE

Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means or U. S. Mail on May 12, 2006.

                                                 s/William J. Barkholz
                                                 Courtroom Deputy Clerk

22